# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD STIERWALT, <br><br> Plaintiff, <br><br> v. <br><br> ASSOCIATED THIRD PARTY ADMINISTRATORS, et al., <br><br> Defendants. | Case No. 16-mc-80059-EMC <br><br> **CORRECTED ORDER RE THIRD-PARTY CLAIM OF SECURITY INTEREST** |

Petitioner Richard Stierwalt initiated this matter after obtaining a judgment against Respondents Associated Third Party Administrators ("ATPA") and United Benefits & Pension Services, Inc. ("UBPS") in a New York federal court. The judgment totaled more than $626,000. Mr. Stierwalt asked this Court for, and obtained, a writ of execution so that he could get levy on monies held by ATPA in a bank account held with U.S. Bank within this District. After the U.S. Marshal obtained the funds from the bank, but before the funds could be released to Mr. Stierwalt, third-parties CAMOFI Master LDC and CAMHZN Master LDC (collectively, "CAM") filed a statement, stating that CAM had a security interest in the monies in the bank account.[1]

Currently pending before the Court is a dispute between Mr. Stierwalt and CAM as to whether the monies in the U.S. Bank account should be distributed to Mr. Stierwalt.

## I. FACTUAL & PROCEDURAL BACKGROUND

Based on submissions in this case and the related case, it appears that ATPA and UBPS are affiliated entities – *i.e.*, ATPA is a wholly owned subsidiary of UBPS. Also, it appears that a third party, Med-Tech Health Solutions, LLC ("Med-Tech"), owns the majority of the stock of ATPA

---

[1] Centrecourt Asset Management LLC is the investment manager for two investment funds whose master funds are CAM. *See* Smithline Decl. ¶ 1.

and UBPS. Finally, it appears that Mr. Stierwalt was once the CEO of both ATPA and UBPS,[2] but that he was terminated from this position, and that he is currently employed by Med-Tech.

After Mr. Stierwalt was terminated, he initiated an arbitration against ATPA and UBPS, claiming that he was improperly terminated without cause, which entitled him to relief under the relevant employment agreement. The arbitrator found in favor of Mr. Stierwalt, and a New York district court confirmed the arbitration. ATPA has appealed that ruling to the Second Circuit.

Although an appeal is pending, Mr. Stierwalt obtained a writ of execution from this Court so that it could collect on the judgment (more than $626,000) obtained. Pursuant to that writ of execution, the U.S. Marshal levied on a bank account that ATPA held with U.S. Bank. However, before any funds were released to Mr. Stierwalt, CAM filed a statement, claiming a third-party security interest in the bank account monies.

CAM claims a security interest because, in November 2012, it loaned more than $12 million to ATPA/UBPS in the form of Secured Notes. In connection with the Secured Notes, ATPA/UBPS also signed a Security Agreement in November 2012. Furthermore, after ATPA/UBPS failed to make payments under the Notes, and CAM sued the guarantors of the Notes and prevailed, ATPA/UBPS (among others) signed a Settlement Agreement in which it confessed to judgment.

There does not appear to be any dispute that the Secured Notes provide that they are "senior in right of payment to any and all other indebtedness of the Company [*i.e.*, ATPA/UBPS]." Docket No. 10 (Exhibits 4 and 5) (Secured Notes ¶ 7(j)).

There also does not appear to be any dispute that, under the Security Agreement, CAM has a security interest in ATPA/UBPS's collateral, with collateral being defined as

> the following personal property of the Debtors, whether presently owned or existing or hereafter acquired or coming into existence, . . . and all proceeds, products and accounts thereof, including, without limitation, all proceeds from the sale or transfer of the Collateral . . . and all dividends, interest, cash, notes,

---

[2] The employment agreement was technically with UBPS only but the agreement contemplated that Mr. Stierwalt would be an officer for UBPS's affiliates, including (specifically named) ATPA.

2

>     securities, equity interest or other property acquired, receivable or otherwise distributed in respect of, or in exchange for, any or all of the Pledged Securities (as defined below):
>
>     (i)     All goods . . .
>
>     (ii)    All contract rights and other general intangibles . . .
>
>     . . .
>
>     (vi)    All deposit accounts and all cash . . .
>
>     . . .
>
>     (ix)    [T]he products and proceeds of all of the foregoing Collateral set forth in clauses (i)-(ix) above.

Docket No. 10 (Exhibit 6) (Security Agreement ¶ 1(a)).

## II.  DISCUSSION

A.  Legal Standard

The procedures for this hearing are governed by the California Code of Civil Procedure. *See* Fed. R. Civ. P. 69(a)(1) (providing that "[a] money judgment is enforced by a writ of execution" and "[t]he procedure on execution – and in proceedings supplementary to and in aid of judgment or execution – must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies").

California Code of Civil Procedure § 720.210 provides that, "[w]here personal property has been levied upon under . . . a writ of execution . . . , a third party claiming a security interest in or lien on the personal property may make a third-party claim under this chapter if the security interest or lien claimed is superior to the creditor's lien on the property." Cal. Code Civ. Proc. § 720.210(a).

Section 720.250 provides that, "if a third-party claim is timely filed, the levying officer may not do any of the following with respect to the personal property in which the security interest or lien is claimed" – *e.g.*, "[d]eliver possession of the property to the creditor" or "[p]ay proceeds of collection to the creditor." *Id.* § 720.250(a).

Section 720.360 provides that, "[a]t a hearing on a third-party claim the third person has the burden of proof." *Id.* § 720.360.

Section 720.390 provides that, "[a]t the conclusion of the hearing, the court shall give judgment determining the validity of the third-party claim and may order the disposition of the property or its proceeds in accordance with the respective interests of the parties. Subject to Section 720.420 [which allows for an appeal], the judgment is conclusive between the parties to the proceeding." *Id.* § 720.390.

Section 720.400 provides that "[n]o findings are required in proceedings under this chapter," *id.* § 720.400, and § 720.410 provides that "[t]here is no right to a jury trial in a proceeding pursuant to this chapter." *Id.* § 720.410.

B. <u>California Commercial Code and Perfection of a Security Interest</u>

In essence, the Court has before it competing claims to ATPA assets. As noted above, CAM maintains that it has a security interest in the U.S. Bank account.

> A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." (Cal. U. Com. Code, § 1201, subd. (a)(35).) Resolving conflicting claims in the same collateral requires a three-step inquiry: First, has the security interest attached; second, has the security interest been perfected; and third, does the perfected security interest have priority. (*See generally Bank of the West v. Commercial Credit Financial Services* (9th Cir. 1988) 852 F.2d 1162, 1166–1174.) Once a security interest has attached to the debtor's collateral (Cal. U. Com. Code, § 9301 *et seq.*), perfection of a security interest makes it enforceable against third parties and priority determines which of competing claims to collateral will take precedence (*see* Cal. U. Com. Code, § 9301 *et seq.*).

*Oxford St. Props., LLC v. Rehab. Assocs., LLC*, 206 Cal. App. 4th 296, 307-08 (2012).

In the instant case, Mr. Stierwalt does not seem to dispute that CAM has a security interest that has attached (*i.e.*, step one). Nor does he dispute that the security interest is senior to his claim, *i.e.*, in terms of time (*i.e.*, step three). Mr. Stierwalt, however, does contest whether CAM perfected its security interest (*i.e.*, step two). *See also* Cal. Comm. Code § 9308, UCC Official Comments ¶ 2 (stating that, "in general, after perfection the secured party is protected against creditors and transferees of the debtor").

Security interests and perfection thereof are governed by the California Commercial Code, which in turn is based on the Uniform Commercial Code. California Commercial Code § 9308

4

provides that "a security interest is perfected if it has attached and all of the applicable requirements for perfection in Sections 9310 to 9316, inclusive have been satisfied." Cal. Comm. Code § 9308(a).

In determining whether the applicable requirements of §§ 9310-16 have been satisfied in the instant case, the Court must first assess what exactly is the claimed security in which CAM asserts an interest. The claimed security is the U.S. Bank account. However, that bank account may be seen as either a direct security or an indirect security – *i.e.*, CAM could assert a *direct* interest in the bank account because, under the Security Agreement, collateral includes deposit accounts or, alternatively, CAM could assert an *indirect* interest in the bank account because, under the Security Agreement, collateral includes the proceeds of contract rights. Different provisions in the California Commercial Code are applicable when the bank account is viewed as a direct security compared to when the bank account is viewed as an indirect security.

To the extent CAM claims it has perfected a *direct* security interest (*i.e.*, the collateral is the bank account itself), that assertion is weak. CAM maintains it has perfected a security interest because "[a] security interest in . . . deposit accounts . . . may be perfected by control of the collateral under Section . . . 9104," Cal. Comm. Code § 9314(a), and, under § 9104, "[a] secured party has control of a deposit account if . . . [t]he secured party becomes the bank's customer with respect to the deposit account." *Id.* § 9104(a)(3). But, as explained by the UCC Official Comments, "[u]nder subsection (a)(3), a secured party may obtain control by becoming the bank's 'customer,' *as defined in Section 4-104*." *Id.*, UCC Official Comments ¶ 3 (emphasis added); *see also* Cal. Comm. Code § 9102(b) (providing that the definition of, *inter alia*, "customer" in § 4104 applies to Division 9 on Secured Transactions). California Commercial Code § 4104 provides that "'[c]ustomer' means a person having an account with a bank or for whom a bank has agreed to collect items." Cal. Comm. Code § 4104(a)(5). CAM has not shown how it has met this definition of "customer."

However, CAM's claim of perfection of an indirect security interest (*i.e.*, the bank account represents proceeds derived from ATPA's contract rights) is stronger. California Commercial Code § 9312 provides that "[a] security interest in chattel paper, negotiable documents,

5

instruments, or investment property may be perfected by filing." *Id.* § 9312(a); *see also id.* § 9102(a)(47) (defining "instrument" as "a negotiable instrument or any other writing that evidences a right to the payment of a money obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment"). As reflected in its third-party statement, CAM claims that it has filed the necessary UCC financing statements, *see* Docket No. 10 (St. ¶ 13) (asserting that "Claimants' security interest has been perfected through UCC financing statements and associated documents, copies of which are attached hereto as Exhibits 7, 8, 9, and 10"), and Mr. Stierwalt does not really argue to the contrary.

Mr. Stierwalt, however, makes other arguments in his opposition. For example, Mr. Stierwalt argues that the monies in the bank account are not "proceeds" because there is insufficient evidence that any contract rights gave rise to those payments of money to ATPA. Mr. Stierwalt also argues that, even assuming ATPA had contract rights which gave rise to proceeds, the bank account contains commingled funds, *i.e.*, both proceeds and nonproceeds, and CAM has failed to identify which monies are the proceeds.

Neither of these arguments is especially convincing. As to the first argument, CAM has submitted a declaration from ATPA's CEO (Henry Ritter) which states that "ATPA performs its services on behalf of its trust clients pursuant to written service agreements" and that "[t]he revenue that ATPA generates is governed exclusively by the service agreements." Ritter Decl. ¶ 7. A sample written service agreement is attached to the Ritter declaration as Exhibit 1. Mr. Ritter's declaration continues that, consistent with the service agreements, "ATPA routinely charges its clients fees on a monthly basis and bills those fees in a written 'Statement of Administrative Services' or 'Statement of Administrative Fees.'" Ritter Decl. ¶ 9. "Once a billing statement is sent out, it is booked as an account receivable ('AR')." Ritter Decl. ¶ 10. When a client payment is actually made, ATPA then deposits the client payment into the bank account. *See* Ritter Decl. ¶ 12.

In light of the sample service agreement and Mr. Ritter's declaration, it does appear that

ATPA had contract rights which gave rise to payments from its clients.[3]

To the extent Mr. Stierwalt tries to characterize the payments made by clients into the bank account as "advances" (*i.e.*, nonproceeds) rather than proceeds, he fares no better. In his declaration, Mr. Stierwalt states that "ATPA is generally paid in advance for its services. Only a small fraction of ATPA's clients pay ATPA following ATPA's provision of services to them. Payments received by ATPA prior to its delivery of associated services comprise approximately ninety-five percent (95%) of ATPA's revenues." Stierwalt Decl. ¶ 10. However, there is nothing to corroborate these statements made by Mr. Stierwalt.

More important, even if the Court were to credit Mr. Stierwalt's statements, that would not necessarily result in a decision in his favor. Mr. Stierwalt relies on a case, *Imperial NH3 v. Central Valley Feed Yards, Inc.*, 70 Cal. App. 3d 513 (1977), where a state court explained that, because "[t]here are no 'proceeds' without a sale," payments advanced *prior* to a sale were not proceeds. *Id.* at 520. Mr. Stierwalt contends that, based on *Imperial*, when ATPA clients made payments in advance of ATPA providing any services, those were not proceeds as no services had been rendered yet. Rather, those payments were just "unsecured debt." *Id.* The problem for Mr. Stierwalt is that the *Imperial* court stated that, "*until delivery [of the goods]*, the advance payments were not 'proceeds' but only an unsecured debt." *Id.* (emphasis added). Therefore, once ATPA provided services (and presumably it did), then any advance payments thereby became proceeds.

Finally, Mr. Stierwalt contends that, even if the monies are deemed proceeds, there remain

---

[3] Mr. Stierwalt protests still on the ground that "noticeably absent from [CAM's] evidence are any of the *actual* contracts between [ATPA] and third parties that are tied by admissible evidence to any of the *particular* transactions described in any detail in [CAM's] evidence." Docket No. 14 (Br. at 8 n.4) (emphasis added). This criticism by Mr. Stierwalt is directed to the fact that Mr. Ritter discusses, in his declaration, three specific examples where ATPA sent an invoice to a client, where the client wired the payment to the bank account, and where ATPA's general ledger reflected that transaction. *See generally* Ritter Decl. ¶¶ 13-18. However, copies of the actual contracts with those three clients are not attached to the Ritter declaration – only the one sample service agreement (with the client name redacted) is attached.

But Mr. Stierwalt's argument ignores the fact that the sample agreement provided by CAM is a representative agreement between ATPA and its customers. Moreover, even the absence of any written contract would not necessarily be damning. Nothing suggests that contract rights as collateral only arise where there is a written contract. Presumably, there was a contract (*i.e.*, agreement) of some kind (oral or written) with the clients, or the clients would not be paying ATPA at all.

7

obstacles to CAM claiming a security interest. For example, Mr. Stierwalt notes that there are more than just client payments that go into the bank account. While this is true, Mr. Ritter's declaration explains that the funds in the bank account "are comprised almost entirely of revenue generated from ATPA AR [accounts receivable], with the exception of a few very small amounts such as the occasional $10 employee payment for a lost security badge and the like." Ritter Decl. ¶ 12. Thus, any commingling is negligible at best. Mr. Stierwalt also contends that any perfected security interest in the proceeds became unperfected pursuant to California Commercial Code § 9315, *see* Cal. Comm. Code § 9315(d) (providing that "[a] perfected security interest in proceeds becomes unperfected on the 21st day after the security interest attaches to the proceeds unless any of the following conditions is satisfied"), but, as CAM points out, that rule does not apply where "[t]he proceeds are identifiable cash proceeds." *Id.* § 9315(d)(2).

Accordingly, for the foregoing reasons, the Court finds that, in all likelihood, CAM had a perfected security interest because the money in the U.S. Bank account represents proceeds of contract rights. Even assuming such, however, CAM cannot prevail for the reasons discussed below.

C. <u>Effect of California Commercial Code § 9332(b)</u>

Even if CAM had a perfected security interest, that would not dictate a result in CAM's favor because Mr. Stierwalt argues that there are still other reasons why he, and not CAM, should be able to get the money – (1) based on California Commercial Code § 9332(b) and (2) based on equitable subordination. The Court need not entertain the equitable subordination argument because it finds in Mr. Stierwalt's favor on the § 9332(b) argument.

Section 9332(b) provides as follows: "A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party." Cal. Comm. Code § 9332(b). The UCC Official Comments for § 9332 explain that the "section affords broad protection to transferees who take funds from a deposit account and to those who take money." Cal. Comm. Code § 9332, UCC Official Comments ¶ 2. The Comments further explain that

> [b]road protection for transferees helps to ensure that security interests in deposit accounts do not impair the free flow of funds. It also minimizes the likelihood that a secured party will enjoy a claim to whatever the transferee purchases with the funds. Rules concerning recovery of payments traditionally have placed a high value on finality. The opportunity to upset a completed transaction, or even to place a completed transaction in jeopardy by bringing suit against the transferee of funds, should be severely limited. Although the giving of value usually is a prerequisite for receiving the ability to take free from third-party claims, where payments are concerned the law is even more protective. Thus, Section 3-418(c) provides that, even where the law of restitution otherwise would permit recovery of funds paid by mistake, no recovery may be had from a person "who in good faith changed position in reliance on the payment." Rather than adopt this standard, this section eliminates all reliance requirements whatsoever. Payments made by mistake are relatively rare, but payments of funds from encumbered deposit accounts (e.g., deposit accounts containing collections from accounts receivable) occur with great regularity. In most cases, unlike payment by mistake, no one would object to these payments. In the vast proportion of cases, the transferee probably would be able to show a change of position in reliance on the payment. This section does not put the transferee to the burden of having to make this proof.

*Id.*, UCC Official Comments ¶ 3.

1. <u>Transferee of Funds</u>

As an initial matter, the Court takes note that an argument could be raised that a judgment creditor who gets funds from a deposit account pursuant to a writ of execution is not a "transferee of funds" for purposes of § 9332(b). However, Mr. Stierwalt points out that there is a case in which a court found the opposite – *i.e.*, that a judgment creditor is a transferee of funds for purposes of the statute. That case is *Orix Financial Services, Inc. v. Kovacs*, 167 Cal. App. 4th 242 (2008).

In *Orix*, the plaintiff-company, Orix, had a security interest in the goods, chattels, and property of another company, ADA. Separately, the defendants obtained a judgment against ADA. The defendants obtained a writ of execution against ADA's deposit accounts. All of the funds in the accounts were derived from the proceeds of the sale of ADA's inventory and collection of its accounts receivable. *See id.* at 246. The defendants successfully levied on the deposit accounts. Orix subsequently sued defendants for unjust enrichment and imposition of constructive trust. *See id.* at 245. The defendants' "satisfaction of [their] judgment from [the deposit account] funds [was] the basis of Orix's complaint." *Id.* at 246. The defendants argued

9

that Orix's complaint should be dismissed based on § 9332(b).

The state court began its analysis by taking note of the UCC Official Comments to § 9332. It then pointed out that § 9332(b) stemmed from an earlier version of the UCC –

> specifically in comment 2(c) to [former § 9-306], which read: "Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfer in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party."

*Id.* at 247.

With respect to transfer in the "ordinary course" (as used in comment 2(c) to former § 9-306), the state court took note of then-Circuit Judge Breyer's comments (from *Harley-Davidson Motor Co. v. Bank of New* England, 897 F.2d 611 (1st Cir. 1990)) that that phrase should not be construed too narrowly:

> [I]f . . . courts too readily impose liability upon those who receive funds from the debtor's ordinary bank account[,] then ordinary suppliers, sellers of gas, electricity, tables, chairs, etc., might find themselves called upon to return ordinary payments (from a commingled account) to a debtor's secured creditor, say a financer of inventory. Indeed, we can imagine good commercial reasons for *not* imposing, even upon sophisticated suppliers or secondary lenders, who are aware that inventory financers often take senior secured interests in all inventory plus proceeds, the complicated burden of contacting these financers to secure permission to take payment from a dealer's ordinary commingled bank account. These considerations indicate that ordinary course has a fairly broad meaning; and that a court should restrict to the use of tracing rules to conduct that, in the commercial context, is rather clearly improper.

*Id.* at 248 (internal quotation marks omitted; emphasis in original).

The state court also took note that comment 2(c) to former § 9-306, which used the language of "operation of the debtor's business" and "ordinary course," did not make its way into § 9332, when enacted (as part of a revision to the UCC). "[O]nly the language regarding 'collusion' did so. . . . [T]he 'collusion' standard is the standard most protective of transferees and is, thus, consistent with that suggested by [now] Justice Breyer." *Id.* at 249. "Thus, the history of

10

the code and its amendments suggests that only transferees who act in collusion with the debtor are excepted from the broad protections of section 9-332(b)." *Id.* at 249.

Orix, of course, did not argue that the defendants colluded with ADA to defeat Orix's interest; instead, Orix argued that "a judgment creditor is not the kind of transferee contemplated by section 9-332(b)." *Id.* On this point, the state court disagreed, stating as follows:

> The broad language of the statute does not support Orix's contention. The drafters of the revised UCC, as well as our Legislature, had the opportunity to include the exception suggested by Orix in the language of the revised codes – the issue was certainly presented by the history of litigation on the subject. They did not do so; we will not do so in the first instance.
>
> We note that the lion's share of transferees from a deposit account are creditors of one form or another – secured, unsecured, judgment, etc. For instance, a landlord and a utility company are creditors and are, ordinarily, unsecured. They would not be excepted from the protections of section 9-332(b). Thus, any suggestion that the rights of a secured creditor cannot be compromised by junior creditors is not persuasive. Indeed, as the comment to section 9-332 quoted above makes clear, a protected transferee need not be a creditor at all, but may have been paid by mistake or otherwise have provided no value to the debtor in exchange for the payment.

*Id.* at 250.

The court also disagreed with Orix's assertion that § 9332(b) "should not extend to a lien creditor who took possession of the funds by garnishment rather than any activity or payment by the debtor." *Id.* In response to this argument, the court stated that the defendants' "status as a creditor is irrelevant, and there is no requirement that the debtor actively or even voluntarily make a payment." *Id.* A transfer "indisputedly [sic] occurred." *Id.*

As indicated by the above, *Orix* clearly supports Mr. Stierwalt's position. Moreover, CAM's attempt to distinguish the case falls short. According to CAM, *Orix* is distinguishable because the case

> did not involve a third-party claim. Rather, the part with the senior security interest sued the levying creditor for unjust enrichment and imposition of a constructive trust. Because the *Orix* court did not evaluate the effect of section 9332(b) on California's third-party claim procedures, it cannot stand for the proposition that a senior

11

> secured party pursuing a third-party claim is defeated because the
> party levying the funds at issue is a "transferee."

Docket No. 18 (Br. at 17). While CAM is correct that *Orix* involved a different procedural posture, there is no material difference. The bottom line is that Orix was claiming as a secured party against a transfer of funds from a bank account, just as CAM is doing in the case at bar.

CAM protests that,

> [i]f any party who levies upon a deposit account is considered a
> transferee under section 9332(b), the entire body of statutory law
> allowing third-party claims under California law would be rendered
> meaningless. There would be no purpose for a third-party claim
> procedure if every time a party levies upon property under a writ of
> execution, that party automatically prevails on any third-party claim,
> simply because he is a "transferee."

Docket No. 18 (Br. at 17). But this argument presented by CAM is too far reaching. Section 9332(b) has applicability to transfers made from deposit accounts only. *See* Cal. Comm. Code § 9332(b) ("A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party."). The California legislature placed deposit accounts on special footing in order to safeguard against the potential disruption to commerce that would occur if payments from such accounts were subjected to the uncertainty of third-party claims.

The Court thus concludes that there was a transfer pursuant to § 9332(b) when the U.S. Marshal levied upon the bank account, such that Mr. Stierwalt "takes the funds free of a security interest in the deposit account." Cal. Comm. Code § 9332(b).

2. Collusion

CAM contends that, even if § 9332(b) is generally applicable to the instant case, CAM – and not Mr. Stierwalt – should still prevail because the exception provided for in the statute, *i.e.*, the exception for collusion, is applicable. That is, CAM takes the position that Mr. Stierwalt acted in collusion with ATPA in violating CAM's rights as a secured party. CAM argues that, necessarily, there was collusion between Mr. Stierwalt and ATPA because Mr. Stierwalt was acting as ATPA's CEO when he, *e.g.*, "wrongfully extracted over $290,000 from the Company for

12

personal uses" (as alleged in the related case), all to the detriment of CAM as a secured party. Docket No. 18 (Br. at 18).

CAM's agency-based argument seems problematic as a legal proposition. *Cf. United States ex rel. Campie v. Gilead Scis., Inc.*, No. C-11-0941 EMC, 2015 U.S. Dist. LEXIS 1635, at *50-51 (N.D. Cal. Jan. 7, 2015) (taking note of the doctrine that a corporation cannot conspire with its own employees or agents because "'it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself'"). But putting that problem aside, there is a more fundamental problem with CAM's position. That is, § 9332(b) is directed at a fraudulent transfer between the debtor and the transferee. The "bad acts" on which CAM relies have nothing to do with the transfer of money from the U.S. Bank account to Mr. Stierwalt at issue here. Rather, they concern acts which predated the transfer. Consistent with this point, Mr. Stierwalt points out that collusion could hardly be said to have happened given that he had to sue ATPA for wrongful termination and, only after prevailing, seek to execute on funds held by ATPA. In any event, there is insufficient evidence that challenged transfer of funds here was the result of collusion.

The Court therefore concludes that the collusion exception provided for in § 9332(b) is not applicable.

### III. CONCLUSION

For the foregoing reasons, CAM appears to have a perfected security interest in the U.S. Bank account. However, as a matter of law, Mr. Stierwalt can take the "transferred" funds (*i.e.*, from the bank to him) clear of the asserted security interest pursuant to § 9332(b).

///
///
///
///
///
///
///

13

The Court therefore orders that that the Clerk of the Court enter a judgment in favor of Mr. Stierwalt with respect to CAM's third-party claim of a security interest. The U.S. Marshal is authorized to release the disputed funds to Mr. Stierwalt.

The hearing on the third-party claim of security interest is hereby **VACATED**.

**IT IS SO ORDERED**.

Dated: May 25, 2016

_____
EDWARD M. CHEN
United States District Judge